Filed 2/6/26  J.B. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| J.B.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF ALAMEDA COUNTY,<br><br>        Respondent;<br><br>ALAMEDA COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>        Real Party in Interest. | A174643<br><br>(Alameda County<br>Super. Ct. No. JD-037464-01) |

J.B. (mother) seeks extraordinary relief from a juvenile court order issued at the combined six/twelve month review hearing that terminated family reunification services and set a permanency planning hearing under Welfare and Institutions Code section 366.26.[1]  Mother argues the Alameda County Social Services Agency (Agency) failed to provide her with reasonable reunification services and requests a continuance with additional

---

[1]Further undesignated statutory references are to the Welfare and Institutions Code.

1

reunification services.  Mother also challenges the court's failure to return her child to her care, custody, and control.

We deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

On April 18, 2024, the Agency filed an original dependency petition pursuant to section 300, subdivisions (b)(1) and (e) against mother and father, for failure to protect and severe physical abuse of their five month old daughter, E.E. [3]  The petition alleged that on or around April 9, 2024, E.E. was in the care of father and found to be unresponsive and not breathing in the home.  She was transported to the St. Rose Emergency Department and then transferred to the Pediatric Intensive Care Unit at the UCSF Benioff's Children's Hospital Oakland.  E.E. had experienced cardiac arrest and had no oxygen flow to her brain for 30 minutes.  She presented with swelling to her

---

[2] We limit our summary to the facts and procedural history relevant to the issues raised in this petition.

[3] As relevant here, section 300 provides:  "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶]  (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:  [¶]  (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child.  [¶] . . . [¶]  (e) The child is under five years of age and has suffered severe physical abuse by a parent . . . .  For the purposes of this subdivision, 'severe physical abuse' means any of the following:  any single act of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; any single act of sexual abuse that causes significant bleeding, deep bruising, or significant external or internal swelling; or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness; or the willful, prolonged failure to provide adequate food."

brain, and at the time of the petition, was in a coma. X-ray imaging showed that E.E. had three fractured ribs with calcium formation indicating seven to ten days of healing, and a fracture in her left hand under the thumb area.

The petition alleged that mother and father were the only caregivers to E.E. and they had no explanation for the fractures she sustained or how she could have gone into cardiac arrest. Additionally, the medical experts at the hospital caring for E.E. reported that the fractures were not consistent with chest compressions performed during cardiopulmonary resuscitation (CPR). Based on these facts, the Agency alleged that E.E. was not safe in the care of her mother and father "due to their lack of explanations not being consistent with the sustained injuries."

As detailed in the Detention Report filed April 19, 2024, the child welfare worker (CWW) met with mother and addressed the allegations in the petition. Mother stated that she did not know what happened to E.E. or how or when the fractures occurred. The CWW asked specific questions about how the injury may have occurred, and mother responded "no" to each question while keeping her head down. The CWW also met with father and addressed the allegations in the petition. When asked about the rib fractures, father stated that the paramedics informed him that they performed intensive chest compressions, which, in his opinion caused the fractures. The CWW informed father that the fractured ribs were in a healing stage and that chest compressions could not explain why and how E.E. sustained rib fractures that were now healing, but father only repeated the same explanation for the injuries.

The report described the CWW's visits to the hospital on April 12 and April 18, 2024. E.E. was in a comatose state and connected to oxygen to help her breathe. During the April 18, 2024 visit, E.E. was also connected to a

3

nasal feeding tube. E.E.'s doctors informed the CWW that E.E. did not have any purposeful movement at the time, which meant that her brain was not communicating with her body to move. One of E.E.'s doctors told the CWW that if E.E. survived, she would have developmental delays and severe brain injury because of the deprivation of oxygen to the brain for 30 minutes.

Another doctor explained to the CWW that E.E's fractures were inconsistent with fractures potentially caused by CPR and that doctor opined that based on their state of healing, her fractures occurred prior to CPR being performed. The same doctor also reported that E.E. was seen at the hospital for a visit when she was two months old where she presented with a bruise on her cheek, for which mother claimed E.E. hit herself. The doctor was not convinced a two-month-old could cause such a bruise to herself.

A medical social worker at the hospital reported to the CWW that in her assessment, something happened with the parents and E.E. that they were not sharing, as the parents' behavior was consistent with parents who have harmed a child. The medical social worker stated that mother was detached, showing no emotions. The social worker also reported that father was very emotional and presented as "over the top" with his emotions.

The juvenile court held a detention hearing on April 19, 2024, and found a prima facie showing in the report that the minor fell within section 300, detained the minor, and vested the Agency with authority to provide temporary care, custody, and placement of the minor. The court ordered the Agency to arrange for supervised visitation between the minor and her parents as frequently as possible.

On May 13, 2024, the Agency filed its initial Jurisdiction/Disposition Report. In it, the Agency recommended that the juvenile court find the allegations in the petition true and that the minor remain in out-of-home

4

care, with family reunification services offered to mother and father. The report noted that E.E. remained comatose and that the doctors identified two additional posterior right rib fractures that were newer than the previously discovered fractures and possibly caused just prior to or around the time E.E. went into cardiac arrest and was admitted to the hospital. The doctor explained that it was possible for CPR to cause such injuries to an infant, but it was very unlikely.

The report noted that E.E.'s medical team had not discovered any medical or physical explanation for why E.E. went into cardiac arrest and stopped breathing. The pediatric nurse practitioner explained to the CWW that the initial injuries to the ribs and hand would have been caused by two different traumas, but there is no way to tell whether they happened at the same time, immediately after one another, or at different times. The pediatric nurse practitioner also explained that E.E.'s brain damage was "diffuse, meaning it is all throughout her brain" and the minimal amount of healthy brain tissue will not be able to compensate for the damaged areas. In other words, this type of brain damage does not heal over time, and any current deficits would not get better. She also explained that E.E.'s current brain activity was primitive, meaning her movements were reflexive; she did not have any purposeful movement.

The medical social worker reiterated to the CWW that E.E. had extensive brain damage and that it was unlikely she would awaken from her coma. E.E. was successfully breathing without a breathing tube but required a Continuous Positive Airway Pressure (CPAP) mask. The social worker noted that mother and father had learned how to apply suction to clear E.E.'s mouth and nose, as she has a lot of secretion and cannot cough or swallow on

her own. They had also learned how to feed E.E., clean her feeding tube, and change her diapers.

The report also noted that as of April 23, 2024, mother had denied any history of intimate partner violence, but on April 26, 2024, mother contacted the CWW to report that things between her and father were "getting bad." Mother described father as aggressive, not wanting to allow mother's family to remain at the hospital for visits, and preventing her from talking to others about their situation. She shared that father had hit her in the past. Mother also told the CWW that father may have harmed E.E., stating, "I don't know for certain, but I don't know what else it could be." When later asked why mother had not disclosed this history of intimate partner violence, she stated that father was always present.

Father consistently denied any history of intimate partner violence. Initially, he was reluctant to speak to the CWW and he had not made himself available to speak after the detention hearing. However, on April 23, 2024, father provided his recollection of the events leading to E.E.'s hospitalization. He told the CWW that mother left for work at around 9:40 p.m. and he put E.E. down in her crib and was in the kitchen when he realized he could not hear E.E., which was unusual. Father went into her room and found E.E. unresponsive. He put her on the floor and began performing "mouth to mouth." Father then called 911 at 10:29 p.m. and they walked him through CPR, which he performed on a flat surface. The paramedics arrived quickly and took E.E. to the hospital. Father stated that the paramedics told him that his actions prevented E.E. from dying.

On May 7, 2024, the CWW confronted father regarding mother's disclosure of intimate partner violence. Father denied that he was violent towards mother. Father again stated that he did not do anything to harm his

6

daughter.  When asked why he thought mother disclosed intimate partner violence, father stated it was likely due to the Agency stressing her out, asking her so many questions, and her trying to understand what is going on.

The next day, father recalled that before the hospitalization, mother, father, and E.E. had a great life together.  He went to the hospital every day to visit E.E. and wanted to learn how to care for her.  Father also expressed his desire for E.E. to return home.  When asked if he was concerned about what caused these injuries or if he believed that the hospital was exaggerating E.E.'s medical condition, he replied that there was misinformation.  Father was disturbed that he and mother were going through this investigation and court proceeding while their daughter was in the hospital only because there is no explanation for what happened to E.E. He again stated that he and mother never hurt E.E.

On May 14, 2024, the juvenile court held a hearing where it admitted the Detention Report and Jurisdiction/Disposition Report in evidence.  The court also set a contested hearing for late June as minor's counsel objected to the recommendation that reunification services be offered to the parents. That hearing date was later continued to August 21, 2024.

On May 28, 2024, the Agency filed an initial case plan for mother and father.  Mother had three service objectives:  to interact with E.E. without physical abuse or harm; maintain a relationship with E.E. by following the conditions of the visitation plan; and show that she will not permit others to physically abuse E.E.  It recommended mother receive counseling/mental health services and education services "to develop skills and strategies for being a safe and protective parent" and to "learn skills for caring for [E.E.]'s unique developmental and medical needs, such as feedings, suctioning, changing clothes, changing wraps, etc."

7

On August 20, 2024, the Agency filed an addendum to the May 13, 2024 Jurisdiction/Disposition report. The Agency maintained its recommendation that the court find the allegations in the petition true and that family reunification services be offered to mother and father.

The addendum provided an update on E.E.'s condition. E.E. remained at the hospital in a comatose state, with an unknown discharge date. E.E.'s attending physician reported that E.E.'s breathing was currently supported by a CPAP machine, which is not a traditional breathing machine but prior efforts to use a more traditional breathing machine were not successful. The doctors noted that the use of a CPAP machine is not sustainable over time because the mask would cause trauma to E.E.'s face. The doctor stated that E.E. did not have a stable airway and did not have any gag reflex or ability to swallow, causing secretion to build up in her throat and inadvertently block her airway. Therefore E.E. was at risk of suffocation. Should a blockage develop, immediate medical intervention was required. The doctors emphasized that E.E. required 24-hour nursing support to prevent the minor from suffocating.

To address this issue, E.E.'s doctors recommended she undergo a tracheostomy procedure to stabilize her airway and enable her to be placed in a lower level of care. The tracheostomy would not improve E.E.'s cognitive ability or brain health. Mother and father had not consented to the procedure. One doctor commented that "they do not want to hear it" and that father "wants things to be natural" although father never explained what that meant. One doctor expressed concern that the parents demonstrated a sense of denial regarding E.E.'s condition.

Another doctor mentioned evidence of atrophy in E.E.'s brain and that her head was not growing. The medical team had no expectation for E.E.'s

improvement because they had not observed any measurable positive changes and her extremities were getting stiffer. The medical team was keeping her alive through medication to maintain her heart rate and blood pressure and with the CPAP machine. This doctor recommended that E.E. be taken off the CPAP machine to allow for a natural death because she has no quality of life.

The report also explained that mother had engaged in individual counseling and was attending her parenting course, though she could not identify any parenting characteristics that she developed from the course. Mother also engaged in individual counseling.

Between August to December 2024, the juvenile court held a multi-day contested jurisdiction and disposition hearing. At the hearings in August, the CWW and pediatric nurse practitioner testified to the matters contained in the reports. At the October 22, 2024 hearing, the court asked the Agency to develop a case plan that offered services to mother and father that were more narrowly tailored to their specific situation.

On November 19, 2024, the Agency submitted another addendum to the Jurisdiction/Disposition report wherein it continued to recommend that the court find the allegations in the petition true and offer reunification services for mother and father. This report explained that a tracheostomy had been performed in September 2024. E.E.'s attending physician stated that E.E. "has been stable for quite some time" and that the "medical team aspires to administer a 'Cuffless' [tracheostomy] tube, which would allow [her] to manage breathing without ventilation support." The doctor reported that E.E. still experienced minor secretion build-up in her throat that requires medical intervention to clear her airways. The doctor explained that E.E. is " 'tolerating her feeds' " which were now administered through a Gastrostomy

9

Tube (G tube). E.E. was experiencing muscle spasms due to being in a prone position for an extended period. When asked about E.E.'s diffuse brain injury, the doctor responded that nothing had changed, which suggested that her brain tissue had not healed and that she would likely not recover. The doctor explained that E.E. was not now in a comatose state, rather she remained in a non-responsive state. She had not demonstrated any purposeful movement or any ability to utilize her motor, cognitive, or sensory skills.

E.E.'s pediatrician described E.E. as having a " 'devastating neurological injury' " for which she will require a G tube, tracheostomy tube, and ventilator for the rest of her life, opining that E.E. will never progress to a cuffless tracheostomy. The pediatrician reported that E.E. would continue to experience seizures after her discharge from the hospital which was scheduled for November 19, 2024. When asked about an appropriate setting for visitation given E.E.'s extensive health needs, the pediatrician stated that the parents would be unable to take her "out into the world" because neither mother nor father had been fully trained on her tracheostomy needs, and that an "event" could arise at any moment, therefore someone fully trained would need to be nearby to support with tube changes. The pediatrician noted that mother had completed at least three training sessions related to the tracheostomy but did not complete the entirety of the training, though it was noted that training was prioritized for the resource parent. Father had not completed any training.

The addendum report included mother's statements that she continued to be in a relationship with father and that it was improving. When asked if she discussed E.E.'s fractured bones and brain injury with father, mother stated that "yeah, I have, and it is the same thing. There is no answer." The

report reflected the Agency's ongoing concern about the lack of explanation for E.E.'s injuries, mother and father's continued position that they do not know what caused her injuries, and their lack of willingness to discuss the source of the injuries.

With this addendum, the Agency also submitted an updated case plan. The case plan identified three new objectives for mother during the first six months of services: (1) develop and employ age-appropriate, emotionally supportive and nurturing parenting practices for E.E. and demonstrate an ability to protect the minor from physical harm; (2) explore the circumstances surrounding E.E.'s injuries (brain/neurological injury, rib and hand fractures) during individual counseling and identify strategies to protect the minor from future harm; and (3) demonstrate her ability to foster a nurturing environment and household free of domestic violence.

On November 20, 2024, the juvenile court admitted all reports and addendums into evidence and continued the case to December 5, 2024. On December 5, 2024, the court concluded the contested hearing and found true by a preponderance of the evidence the allegations pursuant to section 300 subdivision (b)(1) and subdivision (e). In doing so, the court stated:

> "[T]his is one of the more disturbing physical abuse cases that I've seen to a minor in nine years . . . . [¶] . . . [¶] I have to say it is difficult for the Court to believe that there are really any services that are available if the parents are in denial about what has happened to the minor. So I say that to say this is a minor under three at the time of removal. The expectation is that there's six months of services . . . [¶] [A]s to how to deal with the tracheotomy and to have the minor on their own . . . . [¶] So they have a fairly short period of time to make some pretty significant

11

progress. . . . I continue to have concerns . . . that nobody still knows anything about how this happened. And even comments by [mother] as to when she talks to the father about it, there's just no answer."[4]

The juvenile court declared E.E. a dependent of the court, and made all necessary findings to remove E.E. from the physical custody of the parents. It also adopted the most recent proposed case plan and ordered the Agency to provide family reunification services to mother and father including supervised visitation at the out-of-home placement. The court also set a date for the six month review hearing.

The court specifically admonished the parents that: "Reunification services are, in fact, time limited. Because there is a child who was under the age of three on the date of removal, services will not extend beyond six months from the initial disposition hearing unless the court finds at the six-month review hearing that here is a substantial probability that [E.E.] will be returned by the 12-month permanency hearing." "If you fail to visit your child for a period of six months, fail to participate regularly in any Court-ordered treatment program, fail to cooperate or avail yourselves of services provided, a hearing to terminate parental rights could be set at the six-month hearing." "If you do not [regain] custody of your child within the time permitted by law, the Court will develop a permanent plan that may result in termination of parental rights and adoption, appointment of a legal guardian,

---

[4] The juvenile court acknowledged that had it found the allegation pursuant to section 300, subdivision (e) proven by clear and convincing evidence, the parents would be bypassed for services. (§ 361.5, subd. (b)(5) Minor's counsel urged the court to bypass the parents at the disposition part of the hearing.

permanent placement with a relative or placement in a planned permanent living arrangement."

On May 9, 2025, the Agency filed a six-month status report that recommended E.E. remain a dependent of the court and that reunification services continue for mother and father. The report noted that mother recently delivered a new baby with father. The report also noted that mother had made progress on her case plan, completing a parenting class, engaging in therapy, and participating in domestic violence classes. Mother acknowledged that she needed to learn how to care for E.E.'s medical and emotional needs and then demonstrate those skills when visiting E.E. However, mother had yet to complete her trainings for feeding and otherwise caring for E.E. During visits, mother did not offer to help care for E.E. and instead requested the resource parent or the nursing staff suction E.E.'s airway when needed or change her diaper.

Regarding E.E., she had been placed in a small family home with 24-hour, seven day per week nursing care provided by a team of six registered nurses hired by a medical caregiver. The caregivers were meeting all of E.E.'s medical needs and E.E. appeared to be comfortable in her placement. The caregiver observed that E.E. had muscle spasms and seizures, that E.E.'s legs were deformed due to lack of muscle growth, and that E.E. was able to pick her head up and turn it, suggesting some physical and cognitive ability. Despite this, the report noted that E.E. was not showing signs of purposeful movement, but overall, her condition had not declined.

On May 20, 2025, at the scheduled six-month review hearing, minor's counsel objected to the continuation of services and a contested hearing was set for July 9, 2025.

13

On June 27, 2025, the Agency filed an addendum to the six-month report. It reported that mother continued to be consistent in attending domestic violence classes, individual therapy, and visiting E.E. weekly. The report also noted that during visits mother helped care for E.E., including changing diapers, suctioning, and feeding her. Mother attended to E.E. when the monitors started to alarm, adjusting E.E. to make her more comfortable and to make sure she continued breathing. The caregiver supported mother when she was unsure of the next steps. The report found that mother needed to continue practicing caring for E.E. and demonstrate an understanding or full medical knowledge of E.E.'s needs, recommending mother take a medical class to learn how to fully support and care for E.E.

The report concluded that mother was progressing partially in her case plan but still had significant progress to make in demonstrating an ability to care for E.E.'s medical, emotional, and physical needs while keeping her safe. The report noted that the parents would need medical training beyond the G tube training they already completed. The CWW suggested that the parents enroll in a certified nursing assistance (CNA) course that would provide the basic medical training pertinent to E.E.'s needs, which would take about six weeks to complete. When asked again about an explanation for E.E.'s injuries, "neither parent had an explanation." The report recommended continuing reunification services for the parents to the twelve-month hearing to give them time to demonstrate an ability to care for E.E. long term. [5]

On July 9, 2025, the contested six-month status hearing was continued to September 5, 2025. The Agency filed an updated case plan on July 10,

---

[5] On July 1, 2025, minor's counsel filed an objection to the continuation of services noting the six-month statutory timeline for reunification services involving a child under three expired on June 5, 2025, and the twelve-month statutory timeline for services expired on June 1. (§ 366.21, subd. (e)(3).)

2025, requiring mother to enroll in and complete an appropriate medical course to provide her the knowledge and skills to manage E.E.'s care.

On August 15, 2025, the Agency filed another addendum report recommending that family reunification services continue for mother and father. Mother had not enrolled in a medical class and was still looking for one. The Agency's public health nurse was also establishing a curriculum to train mother on E.E.'s medical needs. E.E. remained in the same condition with no purposeful movements, despite growing bigger.

The report stated that mother seemed to understand that she was not equipped to care for E.E. without proper medical training. Mother continued with individual therapy, domestic violence classes, and visiting E.E. regularly. By this time, father had stopped individual therapy and only visited E.E. sporadically. The parents had not responded to efforts to obtain their consent to the Early Start Program support services for E.E. The Agency recommended the parents continue family reunification with a focus on obtaining medical training to care for their daughter.

On September 5, 2025, the juvenile court held a contested hearing where the CWW testified to the facts in the Agency's reports. The CWW stated that E.E.'s placement was open to longer visits, adding visits, and had agreed to provide hands-on training for mother and father so they could learn how to care for E.E.'s medical needs. The CWW added that the Agency had referred mother to a suitable training program, for which the Agency would pay, but mother did not enroll. The CWW also testified that E.E. still required and was receiving 24/7 care at her placement. E.E. remained on a ventilator and needed a G tube to eat. The CWW did not believe it would be detrimental for mother and father to receive additional reunification services because E.E. was receiving great care from her medical team and there would

15

be no "worse consequence" because E.E. is stable and, in her opinion, did not know what was happening emotionally. The court continued the hearing.

On October 16, 2025, the juvenile court issued its decision on what was now a combined six-month/twelve-month review hearing. The court initially noted that the twelve-month review date was June 16, 2025, and that October 16, 2025 was approximately 18 months after the minor was initially removed from mother and father's custody. The court stated: "Although the parents have made some strides with regard to progress on her case plan, the Agency, by its own admission in its trial brief concede[s] that the parents still have a significant amount of progress to make, mostly around demonstrating the ability to care for [E.E.]'s medical, emotional and physical needs." The court also found there was not "a substantial probability that the child would be returned to the parents' care in the next six months even if we went another six months."

The court explained that it did not "know if the parents will ever get to the point where they can provide all of [E.E.'s] care" based on the court's understanding of her needs. The court recognized that mother "has done a lot," including consistently visiting E.E., but "she also still has much more to do in terms of her case plan in order to learn and assist the caregiver in providing care to [E.E.]" The court found, by clear and convincing evidence, that the Agency provided reasonable services to the family. The court also considered the extent to which the parties availed themselves of the services provided and found that mother only made partial progress toward alleviating or mitigating the causes necessitating placement.

The juvenile court also found, by a preponderance of evidence, that "return of the child would create a substantial risk of detriment to the safety, protection or physical or emotional well-being of the child. And the factual

16

basis for this conclusion is stated on the record including that [mother] and [father] have not participated regularly or made substantive progress in court order[ed] treatment programs, made substantial progress in complying with the case plan, or alleviated or mitigated the causes which necessitated the out-of-home placement." Based on these findings, the court terminated mother and father's reunification services and set a date for a section 366.26 hearing.[6]

On October 23, 2025, mother's counsel filed a Notice of Intent to File Writ Petition.

## DISCUSSION

### A. *Statutory Scheme*

Our Supreme Court provided a helpful overview of dependency proceedings in *Michael G. v. Superior Court* (2023) 14 Cal.5th 609: "Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency. [Citations.] At the jurisdictional stage, the juvenile court determines whether to declare a child a dependent of the court because the child is suffering, or at risk of suffering, significant harm. (Welf. & Inst. Code, § 300.) At the dispositional stage, the court decides if the child

---

[6] At the twelve-month hearing, the juvenile court was required to determine a permanent plan for E.E. (§ 366.21, subd. (f)(1).) Specifically, the statute provides, "[a]t the permanency hearing, the court shall determine the permanent plan for the child, which shall include a determination of whether the child will be returned to the child's home and, if so, when, within the time limits of subdivision (a) of Section 361.5. After considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of their parent . . .unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . .would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (*Ibid.*)

can be returned to, or must be removed from, a parent's custody. (Welf. & Inst. Code, §§ 315, 319.) During the reunification stage, qualifying parents are offered services to address the causes that led to the loss of custody. (*Id.*, § 361.5, subd. (a).) Finally, if the child cannot be safely returned to the parent within a statutorily specified timeframe, the juvenile court proceeds to the permanency stage, where it either terminates parental rights and places the child up for adoption or it selects another permanent plan, such as placement with a guardian or in long-term foster care. (§ 366.26.) Throughout the proceedings, the juvenile court is instructed to pay careful attention to the well-being of the child, the efforts of the parent, and the services provided by the state to ensure that cases proceed to this final stage only when necessary." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624, fn. omitted (*Michael G.*).)

"When a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family." (*Michael G.*, *supra*, 14 Cal.5th at p. 624.) "Parents of children under three are presumptively eligible for at least six months of reunification services." (*Id.* at p. 625.) The juvenile court must hold periodic review hearings, typically at six month intervals, to evaluate, among other things, the adequacy of the reunification services offered or provided and the extent of the parent's progress. (*Ibid.*)

At the six and twelve-month review hearings, the juvenile court "shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subds. (e)(1) and (e)(2); see also *David B. v. Superior Court* (2004)

18

123 Cal.App.4th 768, 789.)  At the six and twelve-month review hearings, the "court may schedule the section 366.26 permanency planning hearing 'only if' it finds 'there is clear and convincing evidence that reasonable services have been provided or offered to the parents or legal guardians.' " (*Michael G.*, *supra*, 14 Cal.5th at p. 625, quoting § 366.21, subd. (g)(4).)

**B. *Standard of Review***

" 'We review the juvenile court's findings for substantial evidence, and the juvenile court's decision making process based on those findings for abuse of discretion.' " (*B.D. v. Superior Court* (2025) 110 Cal.App.5th 1132, 1150 (*B.D.*); see also *Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 419 [reasonable services finding]; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763 [substantial risk-of-detriment finding].)  Under this standard, we do not reweigh evidence or exercise independent judgment but review the record "in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders." (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)  " '[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*B.D.*, *supra*, 110 Cal.App.5th at p. 1150, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

**C. *Reasonableness of Reunification Services***

"Because family preservation is ' "the first priority" ' in dependency proceedings, ' "the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family." ' " (*B.D.*, *supra*, 110 Cal.App.5th at p. 1150, quoting *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 174–175.)  "When a child has

been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family. [Citations.]  Such services may, depending on the case, include . . . counseling, parent education, substance abuse treatment and testing, and other forms of assistance." (*Michael G., supra*, 14 Cal.5th at p. 624, fn. omitted; *B.D., supra,*110 Cal.App.5th at p. 1150, quoting *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 174–175 [" 'the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family' "].)

"In making its determination, the court shall review and consider the social worker's report and recommendations . . . ; shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which they availed themselves of services provided." (§ 366.25, subd. (a)(1).) Further, "the court shall determine whether reasonable services have been offered or provided to the parent or legal guardian." (*Id.*, subd. (a)(3).)  " 'The adequacy of the reunification plan and of the [Agency]'s efforts to provide suitable services is judged according to the circumstances of the particular case.' " (*In re A.O.* (2025) 111 Cal.App.5th 1048, 1062.)

" 'Reunification services must be "designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." ' [Citation.]  'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.]  Thus, while ' "services need not be perfect,' " they ' "should be tailored to the specific needs of the particular family." ' [Citation.]  In this regard, ' "the record should show that the supervising Agency identified the problems leading to the loss of custody, offered services designed to remedy those problems,

20

maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." ' " (*B.D.*, *supra*, 110 Cal.App.5th at p. 1151.)  Mother has the burden of showing the reasonable services finding is not supported by substantial evidence.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

At the six/twelve-month review hearing, the juvenile court found, by clear and convincing evidence, that the Agency provided reasonable services to the family.  Mother argues that the Agency should have referred mother to services designed to help her learn how to feed from a G tube, suction, change diapers, and comfort E.E. in times of distress.  Mother claims that none of those services were offered or provided.  The record shows otherwise.

Within days of her hospitalization, medical staff taught mother how to perform the suction procedure to clear E.E.'s airways, feed E.E., and clean her feeding tube.  When E.E. left the hospital, the Agency advised mother regarding E.E.'s medical needs including equipment required and round-the-clock care.  The Agency provided mother with many opportunities to learn how to feed E.E. from the G tube, provide suction, and change diapers, and opportunities to practice those skills during supervised visits with E.E.'s care team helping mother.  On multiple occasions, the Agency further referred mother to medical training as provided in the case plan to learn how to provide the medical care E.E. needed.  Indeed, it appears mother did learn certain helping skills including how to change diapers, suction E.E.'s airways when needed, and feed her because she had received G tube training.  The revised case plan offered additional services in addition to counseling classes and parenting classes such as increased visitation.  The caregiver

21

consistently offered to provide more hands-on training for mother and father so they could learn how to medically care for E.E. The Agency referred mother to a CNA course, for which the Agency would pay, but mother never enrolled. The Agency also recruited the Public Health Nurse to develop a personalized curriculum for mother. The record reflects that the CWW continuously communicated with mother to offer support and direction in seeking to acquire the necessary skills to provide for E.E.'s medical and emotional needs with a goal of reunification.

The Agency clearly identified that mother needed particular medical training to be able to care for E.E. physically and emotionally. The Agency provided multiple opportunities for such training and ample opportunities to practice under the tutelage of professionals. The record shows that mother did not engage in those services in a timely manner nor did she fully engage in the opportunities to practice as evidenced by her reluctance or hesitance to provide what E.E. needed during visitation. Based on the facts and analysis above, we find that the record as a whole contains substantial evidence from which a reasonable fact finder could have found by clear and convincing evidence that reasonable services were provided to mother.

**D.** *Substantial Risk of Detriment to Return Minor to Mother's Care*

At the October 16, 2025 six/twelve-month hearing the juvenile court found, by a preponderance of evidence, that the return of E.E. to mother and father would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child because neither parent had "participated regularly or made substantive progress in court order[ed] treatment programs, made substantial progress in complying with the case plan, or alleviated or mitigated the causes which necessitated the out-of-home placement." Substantial evidence supports this finding.

As discussed above, the Agency provided mother with extensive reunification services for nearly 18 months, which was twelve months more than statutorily required given E.E. was five months old on the date of removal from her parents' custody. (§ 366.21, subd. (e).) Mother did not enroll in or complete the necessary medical training to learn how to medically and emotionally care for E.E. as required by the case plan. While mother consistently visited E.E., she did not consistently assist E.E.'s caregivers in caring for E.E. or demonstrate sufficient skills or ability to care for E.E.

The case plan also required that mother explore the circumstances surrounding E.E.'s injuries (brain/neurological injury, rib and hand fractures) during individual counseling and identify strategies to protect the minor from future harm. The Agency expressed concern regarding mother's unwillingness to explore topics regarding E.E.'s injuries. Mother did not engage in these topics and the cause of E.E.'s injuries was never discovered.

Indeed, the most worrisome aspect of this case is that the cause of E.E.'s injuries was never fully explained by parents. It was established that prior to her hospitalization, only mother and father cared for E.E., yet neither parent could explain how such devastating injuries occurred. At one point, mother seems to have grown suspicious of father, but she never pursued her suspicion or attempted to find an answer to this very fundamental question. Mother and father continued living together and had another child together.

The causes that necessitated out-of-home placement were the failure to protect E.E. and the severe physical abuse of E.E. The record demonstrates conclusively that E.E.'s injuries were non-accidental, and they were a product of different trauma-inducing events occurring at separate times prior to hospitalization. The parents seemingly never confronted, examined, or explained how E.E. suffered these injuries. Without an explanation for E.E.'s

life-altering physical injuries the juvenile court could only conclude that E.E. continued to face a substantial risk of harm if returned to either parent's custody. Refusal to take responsibility for the conduct that gave rise to the minor's dependency supports findings that the minor faces an ongoing risk of harm and that reunification services would not benefit the minor. (*In re Madison S.* (2017) 15 Cal.App.5th 308, 327 [upholding denial of reunification services with infant who suffered severe physical injuries in parents' care in light of their unwillingness to acknowledge non-accidental injuries had occurred].)

Mother argues that E.E.'s 24-hour medical team mitigates the risk of detriment of returning E.E. to mother's care to a level below substantial. Mother also suggests that because their newborn baby has not been removed from parents, their home and lifestyle "has been deemed to be safe to support their newborn daughter," therefore it must also be safe for E.E. Additionally, mother claims the court made a fundamental error in assuming that parents must be able to solely meet a child's physical and emotional needs to safely reunify. We find mother's arguments unpersuasive.

First, it is not clear that E.E. will continue to receive 24-hour care if she was placed with mother. The record indicates that the caregiver hired the trained staff, therefore mother would need to do the same. Mother never availed herself of the necessary training to provide for E.E. much less did she develop the skills necessary to organize the professional resources necessary to adequately help care for E.E. in mother's home given her round-the-clock needs.

Second, the fact that mother's newborn has not been removed from mother's home is not particularly relevant. E.E. suffered severe trauma while in the care of mother and father and as a result her life was

fundamentally changed.  She has little to no purposeful movement and it is unclear if she will ever recover from the diffuse brain damage that she has.  The mother's admission of a history of violence with father and the failure to explain E.E.'s injuries as discussed above is a sufficient basis to support the juvenile court's findings.

Lastly, we note that we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings.  (*Kevin R. v. Superior Court*, *supra*, 191 Cal.App.4th at pp. 688–689.)  Therefore, we decline to infer that the juvenile court assumed that the parents must solely be able to care for the minor.  On the contrary, substantial evidence supports the court's finding of substantial detriment based on mother's lack of progress on the case plan, lack of engagement in the services offered, and failure to alleviate or mitigate the causes leading to removal.

## DISPOSITION

The petition for extraordinary writ is denied on the merits.  (See § 366.26, subd. (*l*); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990–991.)  We deny the request for stay, and our decision is final immediately.  (Cal. Rules of Court, rules 8.452(i), 8.490(b).)

_____
Moorman, J.*

WE CONCUR:


_____
Brown, P. J.


_____
Goldman, J.


A174643/*J.B. v. Sup. Ct.*

---

\* Judge of the Superior Court of California, County of Mendocino, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.